IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SERRAH SHAD | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| DELTA AIR LINES, INC. et al. | : | NO. 14-5509 |

MEMORANDUM

Dalzell, J.                                                           April 20, 2015

Serrah Shad, a former customer service agent, filed this eleven-count suit over the circumstances of her September 2012 resignation from Delta Air Lines, Inc. ("Delta"). She alleges national origin discrimination, retaliation, wrongful discharge, breach of contract, breach of implied covenant of good faith, negligent and intentional infliction of emotional distress, intentional and fraudulent misrepresentation, and two violations of the Pennsylvania Human Relations Act. Delta filed a motion to dismiss all of Shad's claims and, for the reasons detailed below, we will grant that motion. Shad also urges that we grant her leave to amend her complaint a second time (although she did not move to amend) and, as explained below, we will deny Shad leave to amend her complaint as futile.

We have federal question jurisdiction over the plaintiff's federal claims pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 1983, and over her supplemental state claims pursuant to 28 U.S.C. § 1367.

## I.     Legal Standard

### A.     Motion to Dismiss

A defendant moving to dismiss under Fed. R. Civ. P. 12(b)(6) bears the burden of proving that a plaintiff has failed to state a claim for relief. See Fed. R. Civ. P. 12(b)(6); see

also, e.g., Hedges v. United States, 404 F.3d 744, 750 (3d Cir. 2005). A Rule 12(b)(6) motion tests the sufficiency of the allegations contained in the complaint and "[t]he question, then, is whether the facts alleged in the complaint, even if true, fail to support the claim." Kost v. Kozakiewicz, 1 F.3d 176, 183 (3d Cir. 1993) (internal citation and quotation marks omitted). As the Supreme Court held in Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007), and Ashcroft v. Iqbal, 556 U.S. 662 (2009), in order to survive a Rule 12(b)(6) motion "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face'," Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 570). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," Iqbal, 556 U.S. at 678.

Our Court of Appeals obliges district courts considering a motion to dismiss under Fed. R. Civ. P. 12(b)(6) to engage in a two-part analysis:

> First, the factual and legal elements of a claim should be separated. The district court must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions. Second, a district court must then determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'

Fowler v. UPMC Shadyside, 578 F.3d 203, 210-11 (3d Cir. 2009) (quoting Iqbal, 556 U.S. at 679).

In deciding a motion to dismiss, all well-pleaded allegations of the complaint must be taken as true and interpreted in the light most favorable to the plaintiff, and all inferences must be drawn in her favor. See McTernan v. City of York, PA, 577 F.3d 521, 526 (3d Cir. 2009) (internal quotation marks omitted). To survive a motion to dismiss, a plaintiff must allege facts that "raise a right to relief above the speculative level on the assumption that the allegations in the complaint are true (even if doubtful in fact)." Victaulic Co. v. Tieman, 499 F.3d 227, 234

2

(3d Cir. 2007) (quoting Twombly, 550 U.S. at 555).

**B.**     **Leave To Amend**

Fed. R. Civ. P. 15(a)(2) requires a party to seek leave from the Court or the opposing party to amend its pleading more than once and urges us to "freely give leave when justice so requires."  Our Court of Appeals has urged that district courts permit curative amendments to complaints vulnerable to Rule 12(b)(6) dismissal even if the plaintiff does not seek leave to amend, unless an amendment would be "inequitable or futile."  Alston v. Parker, 363 F.3d 229, 235 (3d Cir. 2004) (internal citations omitted).  Futility exists when a complaint, as amended, would fail to state a claim upon which relief could be granted.  Holst v. Oxman, 290 F. App'x 508, 510 (3d Cir. 2008).  The same standard determines the futility of an amendment as governs a Rule 12(b)(6) motion to dismiss, that is, "if a claim is vulnerable to dismissal under Rule 12(b)(6), but the plaintiff moves to amend, leave to amend generally must be granted unless the amendment would not cure the deficiency."  Id. (internal citations omitted).

We may also deny leave to amend when special circumstances "such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed [or] undue prejudice to the opposing party by virtue of allowance of the amendment," are evident.  Foman v. Davis, 371 U.S. 178, 182 (1962).  But we must justify any refusal to grant leave to amend.  In re Burlington Coat Factory Sec. Litig., 114 F.3d. 1410, 1434 (3d Cir. 1997) (citing Foman, 371 U.S. at 182).

The decision to grant such leave is within the Court's discretion.  Id.

## II.   <u>Factual And Procedural Background</u>

We draw our recitation of the pertinent allegations from plaintiff's Amended Complaint ("AC"), taking her allegations as we must as true.

Shad is of Pakistani national origin.  AC at ¶ 2.  She began working as a customer service agent at Northwest Airlines, Inc. ("Northwest") on or about July 9, 2007.  <u>Id.</u> at ¶ 19.  In 2008, Delta merged with Northwest and took over its management.  <u>Id.</u> at ¶ 20.[1]  Shad continued working at Delta, where she received satisfactory job performance evaluations.  <u>Id.</u> at ¶ 21.  She was the only Pakistani customer service agent working for Delta at the Philadelphia International Airport at that time.  <u>Id.</u> at ¶ 23.  Most of the customer service agents, and two of the managers, were African-American.  <u>Id.</u> at ¶ 24.

During the time Delta employed Shad, she alleges that her African-American co-workers came to work late or failed to report to work, and were marked "no show", but not terminated, in contrast to Shad who was terminated even though the time off she took had been scheduled in advance and she arranged for her shifts to be covered in her absence.  <u>Id.</u> at ¶ 26.  Shad also alleges that African-American employees were allowed to leave their work stations without permission but she had to ask for permission to do so.  <u>Id.</u> at ¶ 27.  She alleges that one African-American employee damaged a "million dollar aircraft" with a forklift, which she contends was a ground for immediate termination, but that employee was not terminated and continues to work at Delta.  <u>Id.</u> at ¶ 28.  She contrasts that employee's continued employment with the circumstances of her separation where, she states, Lilton Magee, her supervisor, "fraudulently

---

[1] Although Shad has sued both Delta and Northwest, defendant Delta states that Northwest has "ceased all operations and does not exist anymore.  For these reasons, Northwest is improperly named as a party in this action and should be dismissed."  MTD at 1 n. 1.  Shad does not allege that any discriminatory actions occurred before 2008, when Northwest employed her.  We will therefore dismiss Northwest as a party.  As a result, we refer to a single defendant, Delta, where Shad's complaint and opposition papers refer indiscriminately to "defendants."

induced" her into signing a resignation letter thereby terminating her employment.  Id.

Shad alleges that on several occasions prior to her September 24, 2012 termination she complained of her discriminatory and disparate treatment to her supervisors, including Magee "and/or" Theresa Taylor "and/or" Elba Gonzalez, among others.  Id. at ¶ 29.  In September of 2012 Shad suffered "mental stress as a result of the intolerable working conditions" caused by the allegedly disparate treatment.  Id. at ¶ 30.  That month she had scheduled two days of coverage in order to travel to California to visit a hospitalized relative and attend a Christian seminar.  Id. at ¶ 31.  The first day of her absence a co-worker covered her shift without incident. On the second day of that absence the worker she had asked to work her shift was already scheduled to work his own shift and so could not cover for her.  Id.  Shad's supervisor called her in California, where he knew her to be, and told her to report to work in Philadelphia in three hours or she would be disciplined upon her return.  Id. at ¶ 32.  She advised him that was not possible.  Id.  Before this interaction, Shad's station supervisor had told her she would be promoted to supervisor and given a raise upon her return from California.  Id. at ¶ 33.  She was also instructed to train an African American employee, Tracey, as a customer service agent, and did so.  Id. at ¶ 34.

When Shad returned to work on September 24, 2012, Tracey was at Shad's work station performing Shad's job.  Id. at ¶ 35.  Shad submitted a doctor's note (for a previous illness) to her supervisor, Magee, at which point he asked her to sign papers that he said were "just a formality that had to be signed along with her doctor's note."  Id. at ¶ 37.  After she signed, Magee told her she was terminated, having "tricked and fraudulently induced" her to sign a resignation letter without her knowledge.  Id. at ¶¶ 38, 39.  He then told her that Delta would not rehire her because she had failed to give two weeks' notice.  Id. at ¶ 40.  His pretext for terminating her,

5

she alleges, was a two-day absence in December of 2011 and the lack of coverage on her scheduled day off in September of 2012 despite her effort to arrange coverage for that scheduled time off.  Id. at ¶ 45.  Shad contends that she had asked for time in December of 2011 for her wedding in Pakistan and airline flight delays caused her two-day delay in returning to work.  Id. at ¶ 46.

On November 5, 2012, Shad dual filed charges with the Pennsylvania Human Relations Commission ("PHRC") and the Equal Employment Opportunity Commission ("EEOC").  Id. at ¶ 12.  She received Findings of the Investigation and her Right To Sue Notice on February 27, 2013.  Id. at ¶ 13 and Ex. A.  Shad sued Delta on September 27, 2014.  On February 10, 2015 Delta filed a motion to dismiss, and on February 27, 2015 Shad filed an Amended Complaint.

## III.   Discussion

### A.   Delta's Motion To Dismiss

#### 1.   National Origin Discrimination

Title VII makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  Under the familiar McDonnell Douglas burden shifting framework, a plaintiff alleging national origin discrimination must establish a prima facie case by alleging that (1) she is a member of a protected class, (2) she was qualified for the position she sought to retain, (3) she suffered an adverse employment action, and (4) the action occurred under circumstances that could give rise to an inference of intentional discrimination.  See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973); see also Makky v. Chertoff, 541 F.3d 205, 214 (3d Cir. 2008) (Title VII).  The same legal standards apply to Title VII and PHRA claims.  Jones v. Sch. Dist. of Philadelphia,

6

198 F.3d 403, 409 (3d Cir. 1999).

      If Shad can show a <u>prima facie</u> case, the burden shifts to the defendant to articulate some legitimate, non-discriminatory reason for its action.  <u>McDonnell Douglas</u>, 411 U.S. at 802.  If the defendant can do so, then Shad must prove by a preponderance of the evidence that Delta's purportedly legitimate reason was a mere pretext.  <u>Id.</u> at 804.  And, of course, at this procedural stage we accept as true all of plaintiff's well-pled factual allegations.

      Delta contends we should dismiss Shad's national origin discrimination claim because she can satisfy neither the third nor fourth prong of the <u>prima facie</u> case nor can she show that she was constructively discharged.

      Delta argues first that Shad cannot establish the fourth prong of her <u>prima facie</u> case. MTD at 11.  It contends that the favorable treatment Shad alleges -- an African-American employee who damaged an aircraft with a forklift (allegedly a ground for immediate termination) was not terminated, and African-American employees could leave their workstations without seeking prior permission but Shad could not -- is immaterial because her termination was not based either on her leaving the workstation or damaging an aircraft.  <u>Id.</u> at 12, 13.  Further, Delta contends that Shad's allegation that African-Americans employees who came to work late or not at all were marked "no show" and not terminated is speculative because Shad has failed to identify the employees, who they reported to, or how often they came in late.  <u>Id.</u> at 13.  "There is no basis on which the Court could infer Ms. Shad was similarly situated to these employees or that she was treated differently on account of her national origin."  <u>Id.</u>  Delta urges us to rely on <u>Distajo v. PNC Bank</u>, 2009 WL 3467773 (E.D.Pa. Oct. 27, 2009) (Padova, J.), and <u>Kiniropoulos v. Northampton Cnty. Child Servs.</u>, 917 F. Supp. 2d 377 (E.D.Pa. 2013) (Stengel, J.), in which our colleagues found that claims of national origin discrimination failed when no facts alleged

supported an inference that the defendant terminated the plaintiff on the basis of national origin.

Delta next offers Shad's September 24, 2012 resignation email to Elba Gonzalez, Theresa Taylor and Lilton Magee (who Shad claims coerced her resignation) to show that Shad did not suffer an adverse employment action and therefore fails to satisfy the third prong of McDonnell Douglas.  MTD at 14.  Shad appended a formal resignation letter to the email.  Id.  The September 24, 2012 email states in relevant part:

> HELLO, ALL
> THANK YOU FOR EVERYTHING
> MY FINAL GOOD BYE
> GOD BLESS YOU TAKE CARE
> MAY BE SEE YOU GUYS AROUND SOME TIME WHEN
> FLYING ON CONFIRM TICKET OR DROPPING SOME ONE
> BE BLESSED AND STAY BLESSED
> YOUR'S SERRAH SHAD

Id. at Ex. D.  The appended resignation letter of the same date states in part, "Please consider this my resignation from my position as your customer service agent, effective September 25[,] 2012[.]"  Id.  In her letter, Shad states that she "would like to operate in a wider management sphere" but Delta has "not been willing to provide this opportunity."  Id.  She also states, "Although in some ways you have been fair[,] in some ways, I feel I was so left out when every other co-worker of mine [sic]."  Id.

Delta urges us to consider the email and letter under Pension Benefit Guar. Corp. v. White, 998 F.2d 1192 (3d Cir. 1993), in which our Court of Appeals held that we may consider an indisputably authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document.  MTD at 14 n. 13.  Delta observes that Shad now alleges her supervisor's alleged trickery occurred on September 24, 2012, not the next day as she had originally alleged, a change that, Delta contends, gives rise to an implausible chain of events in which Shad's supervisor prepared a resignation letter in anticipation that Shad would

8

present a doctor's note and then asked Shad to sign the letter under false pretenses, after which Shad that very evening would send the same resignation letter to her managers with a cover email thanking them.  Id. at 15, 16.

In sum, Delta contends Shad's email and resignation letter are inconsistent with her claim that she was tricked into a forced resignation and she therefore fails to show that she has suffered an adverse employment action.

Finally, Delta argues that Shad cannot maintain her constructive discharge claim because she cannot objectively show that Delta knowingly permitted conditions of discrimination so intolerable that a reasonable person subject to them would resign.  See MTD at 16; see also Mandel v. M & Q Packaging Corp., 706 F.3d 157, 169 (3d Cir. 2013).  Delta, in its reply, reiterates that Shad's allegations are legally insufficient to establish an inference of discrimination.[2]  Reply at 3.

In opposition, Shad maintains that she has pled a plausible claim for national origin discrimination.  Resp. in Opp. at 16.  She reiterates that she was fraudulently coerced into her resignation and that her position was filled by an African-American, not a Pakistani.  Id. at 17. She maintains that the cases on which Delta relies are inapposite because therein the terminations occurred because of both plaintiffs' violations of their respective employers' policies.  Id. at 18. By contrast, she states that she has alleged "numerous instances" of Delta's disparate and

---

[2] Delta also argues that Shad should be judicially estopped from arguing she was fraudulently induced to resign because that position is at odds with her claim before the Pennsylvania Human Relations Commission ("PHRC") that her supervisor, Magee, told her to resign or she would be terminated.  Reply at 4 n. 1.  Judicial estoppel is properly classified as an affirmative defense, see Fed. R. Civ. P. 8(c)(1); see also 18B Charles Alan Wright and Arthur R. Miller, Federal Practice and Procedure § 4477 (2d ed. 2014), and therefore not to be considered at the motion to dismiss stage.  Ball v. Famiglio, 726 F.3d 448, 459 n. 16 (3d Cir. 2013) (A defendant may only raise affirmative defenses at the motion to dismiss stage if the defense is apparent on the face of the complaint).

discriminatory treatment.  Id.  She points us again to her allegation that her supervisor "fraudulently coerced [her] into believing she was signing documentation related to her doctor's note that was 'just a formality.' "  Id. at 19.  The email sent after this alleged encounter, she contends, reflects her "shocked and emotional state after being unexpectedly terminated."  Id. Shad further states that she neither authored the letter nor knew of its contents before signing it, but offers no explanation of how it came to be appended to the cordial email she sent the same day.  Id.

In support of her constructive discharge claim, Shad claims she was "regularly subjected to insulting and derogatory comments and conduct" that constituted "discriminatory conditions that a reasonable person would have found intolerable."  Id. at 20.  By way of example, she reiterates her allegation that her supervisor, aware she was in California, threatened to discipline her if she failed to return to work in Philadelphia within three hours, an impossibility.  Id.  She also trained Tracey in anticipation of a promotion only to find Tracey had replaced her.  Id.; see also Sur-Reply at 4-6.

Under the Supreme Court's Twombly/Iqbal guidance, plausibility is the touchstone of a complaint that survives a motion to dismiss.  Our Court of Appeals has held "[t]he plausibility paradigm announced in Twombly applies with equal force to analyzing the adequacy of claims of employment discrimination."  Wilkerson v. New Media Technology Charter School, Inc., 522 F.3d 315, 322 (3d Cir. 2008).  A plaintiff must put forth allegations that raise a reasonable expectation that discovery will reveal evidence of all the necessary elements.  Thompson v. Real Estate Mortg. Network, 748 F.3d 142, 147 (3d Cir. 2014) (internal citations and quotations omitted).

Shad has failed to make factual allegations that permit us to come to any reasonable

inference that her termination occurred under circumstances that could reasonably give rise to legitimately infer intentional discrimination or, indeed, that she suffered an adverse employment action.

As our Court of Appeals has often remarked, the elements of a prima facie case depend upon the facts of the particular case. Jones, 198 F.3d at 411 (internal citations omitted). The relevant inquiry as to the fourth prong is whether Shad can show her separation from Delta occurred because of her national origin. Taking Shad's complaint at face value, her allegations do not raise a reasonable expectation that she can do so. The circumstances Shad alleges -- the coercion she claims or the fact that she, the sole Pakistani customer service agent, was not replaced with another Pakistani -- do not constitute circumstances that give rise to an inference of unlawful discrimination because neither allegation, taken as true, suggests that she was terminated because of her national origin. See Kiniropoulos, 917 F. Supp. 2d at 389 (holding that no facts supported an inference that defendant terminated plaintiff on the basis of his national origin or showed why plaintiff believed that national origin motivated defendant's actions); see also Guirguis v. Movers Specialty Servs., 346 F. App'x 774 (3d Cir. 2009) (finding that plaintiff did not plead sufficient facts when the complaint stated only that plaintiff was an Egyptian native of Arab descent, that defendant discharged him, and that his termination occurred in violation of his civil rights).

We find equally persuasive Delta's argument that Shad cannot satisfy the third prong of her prima facie case because she cannot show that she was terminated or forced to resign.[3]

A claim is facially plausible when the pleaded factual content allows us to draw the reasonable inference that the defendant is liable for the misconduct alleged. See Iqbal, 556 U.S.

---

[3] Because Shad does not contest the authenticity of the resignation letter, we will consider it as White permits us to do.

at 678 (internal citation omitted). Shad's allegation that she suffered an adverse employment action falls short of that mark. We need not belabor whether she was emotionally shattered by the alleged encounter with her supervisor when she sent her resignation letter by email -- that is not the relevant inquiry. The sole question is whether her claim that she was forced to resign is facially plausible when she herself distributed the resignation letter she claims to have been tricked into signing. Her claim is not plausible on its face. Her claim of trickery is further belied by the circumstances of its delivery, which she does not contest, that is, as an attachment to a group email with a cheerful adieu.

Because the circumstances under which Shad resigned fail to plausibly suggest she did so involuntarily, the only sense in which she can have suffered an adverse employment action is through constructive discharge. It is well-established that a constructive discharge claim requires a showing that "the employer knowingly permitted conditions of discrimination in employment so intolerable that a reasonable person subject to them would resign." Mandel, 706 F.3d at 169 (internal citation and quotation marks omitted). Our Court of Appeals applies an objective test to determine whether "the conduct complained of" would foreseeably cause a reasonable person to resign. Goss v. Exxon Office Systems Co., 747 F.2d 885, 887 (3d Cir. 1984). We consider factors such as whether the employee was threatened with discharge or encouraged to resign. Mandel, 706 F.3d at 170 (citing Colwell v. Rite Aid Corp., 602 F.3d 495, 503 (3d Cir. 2010)). Nonetheless, as the Supreme Court held in Iqbal, "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." 556 U.S. at 678 (internal citation and quotation marks omitted).

Shad complained she was regularly subjected to insulting and derogatory comments and

conduct that constituted discriminatory conditions that a reasonable person would have found intolerable.  See AC at ¶ 16.  This allegation, unsupported by any further detail, is nothing more than a bare recitation of the elements of her claim and stops well short of describing an entitlement to relief.  Her other allegations (that her supervisor threatened her with discipline on a single occasion and that she trained an employee who thereupon replaced her) do not constitute work conditions so intolerable that a reasonable person subject to them would resign.  Shad has failed to plead constructive discharge.

Because Shad has failed to make a prima facie case of national origin discrimination or to show that she was subject to intolerable work conditions that could have reasonably forced her resignation, we will grant Delta's motion as to Shad's claim of national origin discrimination.

### 2.   Retaliation

Delta moves to dismiss Shad's retaliation claims under Title VII and the PHRA.  MTD at 6.  First, Delta contends that Shad failed to exhaust her administrative remedies because her PHRC charge raises only a single count of national origin discrimination in connection with her separation from Delta, but fails to allege (or even mention) retaliation.  Id. at 7.  Nor does Shad allege facts in that administrative complaint to support a claim of retaliation, Delta maintains.  Id. at 8.  Delta also argues that, even had Shad exhausted her administrative remedies, her amended complaint fails to plead sufficient facts to support a retaliation claim.  Id. at 9.  Shad alleges that:

> Prior to September 24, 2012, while still employed by [Delta], Ms. Shad complained on several occasions, regarding [her] discriminatory and disparate treatment . . . compared to other employees, to her supervisors at [Delta], including but not limited to Lilton Magee and/or Theresa Taylor and/or Elba Gonzalez, among others.

See AC at ¶ 29.

To make a prima facie case of retaliation, a plaintiff must show that (1) she engaged in protected activity, (2) her employer took an adverse employment action against her, and (3) there was a causal connection between her protected activity and the adverse action.  See Moore v. City of Phila., 461 F.3d 331, 340-41 (3d Cir. 2006).  A plaintiff may establish a causal link by showing either unusually suggestive temporal proximity or a pattern of antagonism coupled with timing.  See Lauren W. ex rel. Jean W. v. DeFlaminis, 480 F.3d 259, 267 (3d Cir. 2007).  Delta contends that Shad's threadbare factual recital is inadequate to establish a prima facie case of retaliation.  MTD at 9.

Shad responds in opposition that (1) we should more liberally construe her PHRC charge because she filed it pro se, (2) although she did not use the word retaliation, her core grievances in that administrative complaint are based on the same retaliatory acts and would therefore "reasonably give rise to an investigation for retaliation," Resp. in Opp. at 14, and (3) the facts she pled sufficiently allege retaliation and the absence of actual dates "is of no consequence," id. at 16.

Exhaustion of administrative remedies is a threshold issue for discrimination claims. Antol v. Perry, 82 F.3d 1291, 1295 n.3 (3d Cir. 1996).  Our Court of Appeals, reviewing the purpose of the exhaustion requirement, explained that "[t]he congressional policy underlying this framework was to resolve discrimination claims administratively through cooperation and voluntary compliance in an informal, noncoercive manner."  Burgh v. Borough Council of Montrose, 251 F.3d 465, 470 (3d Cir. 2001).   A claim is considered exhausted if it is "fairly within" the scope of the administrative complaint or the investigation that arises therefrom. Antol, 82 F.3d at 1295.  "The purpose of requiring exhaustion is to afford the EEOC the opportunity to settle disputes through conference, conciliation, and persuasion, avoiding

14

unnecessary action in court."  Id. at 1296.

Shad's PHRC complaint, which she appended to her Amended Complaint, alleged a single count of national origin discrimination.  In relevant part, Shad stated:

12.     On September 25, 2012, Manager Lilton (LNU) (African American) told me to resign or I would be terminated. I resigned that day by letter.

13.     The reasons given were because I missed two days of work in December 2011 and I did not have coverage for one day I scheduled off in advance in September 2012.

14.     Management knew I was in Pakistan in December 2011 for my wedding and my delay in returning to work was due to a two day flight delay during December 2011.

15.     During September 2012, I scheduled two days of coverage while I traveled to California to visit a sick relative.  The first day, a co-worker worked my shift.  The second day, the co-worker scheduled to work my shift was told he could not work his and my shift.  Manager Lilton called me in California and told me to report to work in three hours or I would be disciplined when I returned to Philadelphia.

16.     African American staff come to work late or fail to report to work and are marked as "no show" and are not terminated.

17.     African American staff is allowed to leave their work station when they want but I must ask permission to leave my work station.

18.     One African American staff caused damage with a forklift to a million dollar aircraft [which] is a ground for immediate termination.  However, the employee was not terminated and is still employed by [Delta].

AC at Ex. A.

Our Court of Appeals has rejected the Fifth Circuit's per se rule that all claims of retaliation are "ancillary" to the original administrative complaint and therefore no further EEOC complaint need be filed.  Waiters v. Parsons, 729 F.2d 233, 237 n. 10 (3d Cir. 1984) (quoting Gupta v. East Texas State University, 654 F.2d 411 (5th Cir. 1981)).  Instead, the Court has adopted a case-by-case approach under which we must examine carefully the prior administrative complaint to determine whether the retaliation claim is fairly within its scope

(here, Shad's national origin discrimination charge) or the subsequent investigation.   Robinson v. Dalton, 107 F.3d 1018, 1024 (3d Cir. 1997).

Our Court of Appeals has identified two circumstances under which subsequent events may be fairly deemed to fall within the original complaint -- that is, when the later incident falls within the scope of the prior EEOC complaint or the investigation that arose out of it.   Id. at 1025 (citing Waiters, 729 F.2d at 235).   For example, in Waiters the employee alleged that her discharge was the product of the "same retaliatory intent" as she voiced in an earlier EEOC complaint.   729 F.2d at 238.   Our Court of Appeals held that a post-termination EEOC filing alleging retaliatory discharge was not necessary in that case because the earlier EEOC investigation "clearly went beyond the specific problem alleged in the formal complaint" and encompassed the employer's entire conduct.   Id.   The Court concluded that the core grievance -- retaliation -- was identical and thus the allegations in the employee's complaint fell within the scope of the earlier investigation.   Id.

Shad, too, alleges that the same retaliatory acts gave rise to the core grievances in her administrative complaint and would therefore reasonably give rise to an investigation for retaliation.   But the PHRC's findings of the investigation, which she provides us as an exhibit to her Amended Complaint, do not support that conclusion.   Delta participated in the investigation. AC at Ex. A.   The agency reviewed documents gathered during the investigation which confirmed that Shad had received "numerous disciplinary warnings regarding her time and attendance and/or performance dating back from 2008 [through] June [of] 2012."   Id.   The agency concluded that the investigation failed to establish a prima facie case of national origin discrimination.   Id.   Since the agency reviewed documents covering a four-year period, it went beyond the specific problem alleged in the complaint.   But notably it did not find grounds on

which Shad can now plausibly contend to have complained of retaliation.  Id.  We cannot

therefore conclude that the core grievance was identical.

      For that reason, we also reject Shad's contention that we should read her administrative

charge liberally because she represented herself.  As the Eighth Circuit succinctly stated under

similar circumstances, "[T]here is a difference between liberally reading a claim which lacks

specificity[] and inventing, ex nihilo, a claim which simply was not made."  Shannon v. Ford

Motor Co., 72 F.3d 678, 685 (8th Cir. 1996).

      We need not consider whether Shad could make out a prima facie case[4] because she has

failed to exhaust her administrative remedies as to her two retaliation claims and is therefore

barred from bringing them in court now.  We will accordingly grant Delta's motion to dismiss as

to these two claims.

          3.      **Wrongful Discharge**

      Delta urges that we dismiss Shad's wrongful discharge claim because (1) it is preempted

by the PHRA under Pennsylvania law, and (2) she has failed to allege facts sufficient to support

a wrongful discharge claim because she has not alleged her termination violated a "clear public

policy articulated in the constitution, in legislation, an administrative regulation, or a judicial

decision."  MTD at 17, 18; see also Hunger v. Grand Cent. Sanitation, 670 A.2d 173, 175 (Pa.

Super. Ct. 1996).

      Shad responds in opposition that the Pennsylvania Supreme Court has made an exception

for wrongful discharge claims where the termination "implicates a clear mandate of public

---

[4] It bears noting that an absence of dates on which a plaintiff's putative protected activity
occurred, far from being of no consequence, effectively undermines any claimed causation as a
requisite predicate to any retaliation claim.

policy" such as discrimination.  Resp. in Opp. at 21, 22.  Because discrimination is against the

Commonwealth's public policy, she contends that she alleges facts sufficient to establish the

public policy exception to the at-will employment doctrine.  Id. at 23.  She urges that we rely on

Altopiedi v. Memorex Telex Corp., 834 F. Supp. 800, 805 (E.D. Pa. 1993) (Joyner, J.), and

stretch to the circumstances before us our colleagues' holdings concerning wrongful discharge

with specific intent to harm.  Id. at 21.

      Pennsylvania law governs this tort claim.  The strong presumption in the Commonwealth

is that all non-contractual employment is at-will, which gives an employer the right to fire an

employee for any reason or no reason.  McLaughlin v. Gastrointestinal Specialists, Inc., 750

A.2d 283, 287 (Pa. 2000).  To be sure, the Pennsylvania Supreme Court has recognized a limited

number of public-policy exceptions.  Id.  Nonetheless, Shad's reliance on a public-policy

exception here (and on a federal district court case articulating Pennsylvania law) is misplaced.

It is well-settled in the Commonwealth that a discharged employee may not bring a claim for

wrongful discharge based on discrimination without first exhausting the administrative remedies

available under the Pennsylvania Human Relations Act.  Clay v. Advanced Computer

Applications, Inc., 559 A.2d 917, 919 (Pa. 1989).  The Pennsylvania Supreme Court has refined

when legislative exemptions may vitiate the exhaustion requirement, see Weaver v. Harpster,

975 A.2d 555 (Pa. 2009) (exemption from PHRA for employers with fewer than four

employees), and when a public policy of the Commonwealth is implicated, see McLaughlin, 750

A.2d at 288.  But it unalterably requires a plaintiff pressing a discrimination complaint, such as

Shad seeks to do here, to first use the administrative remedies available through the PHRC.  As

the Pennsylvania Supreme Court explained,

            the statutory scheme would be frustrated if aggrieved employees
            were permitted to circumvent the PHRC by simply filing claims in

> court. This would result in the very sort of burdensome, inefficient,
> time consuming, and expensive litigation that the PHRC was
> designed to avert, and would substantially undermine the proper
> role of the PHRC. Certainly, by requiring initial utilization of
> administrative remedies, aggrieved parties are not deprived of their
> <u>ultimate</u> resort to the courts. . . .  [T]he rights of a complainant
> thereunder shall not be foreclosed from being pursued in the
> courts, if, within one year after the filing of a complaint, the PHRC
> dismisses the complaint or fails to enter a conciliation agreement to
> which the complainant is a party.

<u>Clay</u>, 559 A.2d at 920 (internal citations omitted) (emphasis in original).

Because Shad's PHRC complaint alleged only national origin discrimination but made no claim for wrongful discharge, she has failed to exhaust her administrative remedies and may not now press this claim in federal district court.  We will grant Delta's motion as to this claim.

### 4.      **Breach of Contract**

Delta argues that, like her wrongful discharge claim, Shad's breach of contract claim must fail because it is preempted by the PHRA and she has failed to plead sufficient facts to support such a claim because she has not shown the existence of a contract.  MTD at 19, 20.

Shad responds in opposition that Pennsylvania permits breach of contract claims where a plaintiff alleges facts in addition to discrimination to support the breach of contract claim.  Resp. in Opp. at 24 (citing <u>Brennan v. Nat'l Tel. Directory Corp.</u>, 850 F. Supp. 331, 345 (E.D. Pa. 1994) (Joyner, J.)).  She maintains that Delta failed to follow its established procedures and policies by coercing her into signing a resignation letter without her knowledge, an allegation that she contends goes beyond her discrimination claim and therefore can support her breach of contract claim.  <u>Id.</u>  She also asserts that the public policy exception permits her to rebut the presumption of at-will employment because Delta's "disparate and discriminatory acts. . . violated the Commonwealth's mandatory public policy to provide a workplace free of

discrimination."  Id. at 25.

Delta replies that Shad's allegations that it did not follow its policies and procedures --
not raised in her Amended Complaint -- cannot save her claim because the breach of contract
claim relies on the same facts as her discrimination claim.  Reply at 6; see also AC at ¶ 119
(alleging that Delta "did not treat Ms. Shad as other similar employees have been disciplined,
thereby breaching the contract for employment").  Delta also contends that Shad's argument that
the alleged coercion "goes beyond the facts that support [her] claims of discrimination," Resp. in
Opp. at 24, has no merit because any indirect discrimination claim requires a showing of an
adverse act.  Reply at 7.

Shad's reliance on Brennan is misplaced.  In Brennan, the plaintiff claimed her
termination without just cause violated a covenant implied by her employer's express grievance
procedure and the covenants she executed prior to beginning her employment.  850 F. Supp. at
345.  Thus, the plaintiff's claim for breach was grounded in her employer's failure to follow
established procedures (alleged in detail) when it fired her.  Id.  Judge Joyner concluded that she
could succeed in her breach of contract claim without proving discrimination.  Id.  By contrast,
Shad here invokes Delta's failure to follow procedures in general terms, but the factual
allegations concerning the circumstances of her resignation are identical to the facts supporting
her discrimination claim.  Because the facts she alleges do not go beyond those that support her
discrimination claim, she cannot succeed in one without the other.  Thus her claim is preempted
by the PHRA under Clay, 559 A.2d at 919.

Unlike the Brennan plaintiff whose breach of contract claim rested on both her
employer's specific grievance procedure and the covenants she signed when she started work,
Shad fails to plead the existence of anything that could be construed to be a contract.  It is well-

established that a plaintiff establishes a cause of action for breach of contract by pleading (1) the

existence of a contract, including its essential terms, (2) a breach of a duty imposed by the

contract, and (3) resultant damages.  CoreStates Bank, N.A. v. Cutillo, 723 A.2d 1053, 1058 (Pa.

Super. Ct. 1999) (internal citation omitted).   Shad has failed to allege the existence of a contract

or any terms from which we could conclude that the parties had agreed to a contract that

undermined the at-will presumption.  As Iqbal makes clear, a claim is plausible when a plaintiff

pleads factual content that allows the court to draw the reasonable inference that the defendant is

liable for the misconduct alleged.  In the absence of any facts, we are unable to draw any

inference concerning the defendant's liability under this claim.

     We will therefore grant Delta's motion to dismiss as to this Count.

###     5.      Breach of Implied Covenant of Good Faith and Fair Dealing

     Delta also seeks dismissal of Shad's claim for a breach of the implied covenant of good

faith and fair dealing.  It maintains that, as with her breach of contract claim, this claim is

preempted by the PHRA because the acts supporting this common law claim are identical to

those supporting Shad's discrimination claim.  MTD at 21.  Further, Delta contends that a breach

of the implied covenant of good faith and fair dealing is a breach of contract claim under

Pennsylvania law and, as a result, her failure to plead the elements of a breach of contract claim

doom this claim as well.  Id. at 22.

     Shad relies on the arguments she advanced in support of her breach of contract claim.

Resp. in Opp. at 26.

     The claim for breach of the implied covenant of good faith and fair dealing is subsumed

into a breach of contract claim.  LSI Title Agency, Inc. v. Evaluation Servs., Inc., 951 A.2d 384,

392 (Pa. Super. Ct. 2008).  Having already determined that Shad has failed to plead a viable

breach of contract claim, we will also grant Delta's motion to dismiss as to this claim.

### 6.        Negligent and Intentional Infliction of Emotional Distress

Delta next asks us to dismiss Shad's claims for negligent and intentional infliction of emotional distress.  MTD at 23.  It contends, first, that both claims are preempted by the Workers Compensation Act ("WCA") and the PHRA, which bars common law claims based on the same facts as set forth in her discrimination claim.  Id.  Delta also maintains that Shad has not stated a claim for intentional infliction of emotional distress ("IIED"), which requires a showing of behavior "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." Id. at 24; see also Buczek v. First Nat. Bank of Mifflintown, 531 A.2d 1122, 1125 (Pa. Super. Ct. 1987).

Likewise, Delta contends that Shad has not made out a claim for negligent infliction of emotional distress ("NIED"), which arises when (1) the defendant had a contractual or fiduciary duty toward the plaintiff, (2) the plaintiff was subjected to a physical impact, (3) the plaintiff was in a zone of danger, thereby reasonably experiencing a fear of impending physical injury, or (4) the plaintiff observed a tortious injury to a close relative.  Id. at 25; see also Weiley v. Albert Einstein Medical Center, 51 A.3d 202, 217 (Pa. Super. Ct. 2012).

Shad responds in opposition that an IIED claim based on egregious or outrageous conduct, as she avers occurred here, is not barred by the PHRA.  Resp. in Opp. at 27.  She also argues that her IIED claims fall under the so-called personal animus exception of the WCA which arises when a third party injures an employee because of animosity toward that person and occurs when the complained-of conduct is "personal in nature and not part of the proper employer-employee relationship."  Id. at 28, 29; see also Schweitzer v. Rockwell Int'l., 586 A.2d

383 (Pa. Super. Ct. 1990).  She maintains that her supervisor's conduct as alleged was "extreme,

outrageous and retaliatory in nature" and therefore constitutes behavior within an IIED claim.

Id. at 30.  Finally, she contends that the circumstances of her termination constitute a breach of

Delta's duty of care to her and thus make out a NIED claim.  Id. at 31, 32.

      We consider first whether Shad's emotional distress claims are preempted by the PHRA

or the WCA.  We conclude they are not.  In reviewing the legislative history of the Pennsylvania

Human Relations Commission, the Superior Court in Schweitzer held that claims for emotional

distress of all stripes fall outside the purview of the PHRC (although the plaintiff there sought to

bring suit only for intentional, not negligent, infliction of emotional distress).  Without

distinguishing between negligent and intentional conduct, the Superior Court explained,

> The Legislature intended that the Commission would be an expert
> in the field of unlawful discrimination.  However, the Commission,
> like all administrative agencies, can exercise only those
> powers which have been conferred upon it by the Legislature. The Act
> provides specific remedies for the victim of discrimination. . . .
> The Legislature gave the courts the authority to order, in addition
> to the "affirmative action" carried out by the Commission, "any
> other legal or equitable relief as the court deems proper." The
> Legislature chose to give the common pleas court the power to
> award these types of damages instead of the Commission. The
> [Pennsylvania Supreme Court] held that the Commission has no
> authority, let alone exclusive authority, to award damages for
> mental anguish and humiliation arising as a result of acts that
> also constitute unlawful discrimination.

Schweitzer, 586 A.2d at 388 (quoting Pennsylvania Human Relations Comm'n v. Zamantakis,

387 A.2d 70, 73 (Pa. 1978) (internal citations omitted)).  The Superior Court concluded that the

interests Schweitzer sought to protect with her intentional infliction of emotional distress claim

are "fundamentally different" from those she sought to protect in her discrimination claim.  Id. at

389.  "The legislature did not intend to erect a procedural obstacle to recovery when it provided

the Act as an individual's exclusive remedy regarding discrimination as defined in the statute

itself."  Id.

The Superior Court also held that the WCA does not bar tort claims based on alleged emotional distress when the injury arises from actions outside the proper employer/employee relationship, the so-called personal animus exception.  Id. at 391-92.  Accepting as true the conduct Shad alleges (as we must), her allegation that her superior tricked her into resigning might constitute an action outside the proper employer-employee relationship.

Shad nonetheless cannot make out a claim for intentional infliction of emotional distress. She contends that her supervisor's conduct in threatening disciplinary action if Shad failed to return from California to do her shift, tricking her into resigning, and failing to promote her constitutes extreme, outrageous and retaliatory behavior.  She urges that we rely on Hoy v. Angelone, 720 A.2d 745 (Pa. 1998) and Bowersox v. P.H. Glatfelter Co., 677 F. Supp. 307 (M.D.Pa. 1988).  Resp. in Opp. at 30.

Under Pennsylvania law, the bar to show IIED is high.  In Hoy, the plaintiff's superior subjected her to repeated sexual propositions, vulgar comments and profanity on a regular basis, off-color jokes, unwanted physical contact and the posting of a sexually suggestive picture.  720 A.2d at 747.  The Pennsylvania Supreme Court held that this conduct, "while unacceptable," fell short of the egregious conduct IIED is meant to reach.  Id. at 755.  To constitute IIED, the Supreme Court explained, "[i]t has not been enough that the defendant has acted with intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation that would entitle the plaintiff to punitive damages for another tort."  Id. at 754 (internal citation omitted).

In Bowersox, the plaintiff also alleged sexual harassment over a period of years, during which her supervisor subjected her to statements concerning his virility, his trips to strip joints,

and the sexual performance of other female employees.  677 F. Supp. at 307.  Bowersox's
supervisor also asked her about her ability to have sexual relations after surgery, inquired about
her sexual performance and invited her to watch him swim in the nude.  Id.  When she rebuffed
his unwanted attention, he withheld information she needed to perform her job, forbade her to
talk with anyone in the office or answer the telephone, refused to talk to her and followed her
through the printing plant where they both worked.  Id. at 311.  That a supervisor would subject
his female employee to such offensive speech and conduct – while making her job impossible to
do -- "could in the court's opinion lead an average member of the community to exclaim
"Outrageous!"  Id. at 312.  On that basis, the District Court concluded Bowersox had stated a
claim for IIED.  Id.

By contrast, no such exclamation could reasonably greet Shad's threadbare recitation of
her supervisor's alleged conduct.  A single disciplinary threat, training her replacement under
false hopes of a promotion, and being tricked into resigning do not equate with a multiyear
harassment campaign.  Because Shad has failed to show that her superior's conduct is outrageous
enough to constitute IIED under the governing Pennsylvania jurisprudence, we will grant Delta's
motion as to this claim.

We next turn to Shad's claim for NIED.  The Pennsylvania Courts long ago adopted the
Restatement (Second) of Torts, Section 436A, which bars recovery for NIED absent bodily
harm.  Crivellaro v. Pennsylvania Power & Light Co., 491 A.2d 207, 209 (Pa. Super. Ct. 1985).
Shad alleges she can make an NIED claim because she has suffered bodily harm.  Specifically,
she claims that she suffered " damage to her reputation, severe emotional distress, humiliation,
depression and other physical ailments and emotional damages," AC at ¶ 51, and "stress-related
migraine headaches for which she sought and received medical treatment."  Id. at ¶ 137.  She

urges that we adopt the Pennsylvania Superior Court's holding in <u>Crivellaro</u>, where the plaintiff alleged she

> suffered from severe emotional distress and related physical trauma, including intense headaches, uncontrollable shaking, involuntary hyperventilation and shortness of breath, frequent nightmares, inability to control bowels, upset stomach, and an intense tightening of the muscles in the neck, back and chest which produced severe pain lasting several days following each incident.

491 A.2d at 210.

In <u>Crivellaro</u>, the Superior Court turned for guidance for the application of Section 436A to Comment c, which provides in relevant part:

> The rule stated in this Section applies to all forms of emotional disturbance, including temporary fright, nervous shock, nausea, grief, rage, and humiliation. The fact that these are accompanied by transitory, nonrecurring physical phenomena, harmless in themselves, such as dizziness, vomiting, and the like, does not make the actor liable where such phenomena are in themselves inconsequential and do not amount to any substantial bodily harm. On the other hand, long continued nausea or headaches may amount to physical illness, which is bodily harm; and even long continued mental disturbance, as for example in the case of repeated hysterical attacks, or mental aberration, may be classified by the courts as illness, notwithstanding their mental character.

<u>Id.</u>  The Superior Court concluded that Crivellaro had made out a claim for NIED because she alleged "various injuries" that were "of much greater magnitude than the transitory, non-recurring physical phenomena contemplated by" Section 436A.  <u>Id.</u> at 210-11.

Shad points to her claim of depression, other physical ailments, emotional damages, and stress-related migraine headaches.  Resp. in Opp. at 32.  Such vague and generalized ailments do not constitute the various specific injuries Crivellaro alleged.  Because Shad's alleged afflictions do not rise beyond the ambit circumscribed by Comment c, they will not suffice to support a claim for NIED.

Shad has failed to state a claim for NIED.  We will therefore grant Delta's motion as to this claim.

### 7.   Intentional and Fraudulent Misrepresentation

Finally, Shad alleges that she was fraudulently coerced into signing her resignation letter in reliance on her supervisor's statement that the document he tendered for her signature was "just a formality" related to her doctor's note.  AC at ¶¶ 39, 154, 161.

Delta moves to dismiss Shad's misrepresentation claims.[5]  To allege misrepresentation, a plaintiff must show: "(1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance."  MTD at 26; see also Gibbs v. Ernst, 647 A.2d 882, 889 (Pa. 1994).   To show whether her reliance was justified, Shad must show the misrepresentation was not "readily ascertainable."  Id.; see also Toy v. Metropolitan Life Ins. Co., 863 A.2d 1, 12 (Pa. Super. Ct. 2004) ("the recipient of a fraudulent misrepresentation . . . [is] required to use his senses, and cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation").  Delta argues that we should dismiss this claim because Shad cannot plausibly plead that her reliance on her supervisor's representation was justified.  MTD at 27.  "It is incumbent on Ms. Shad to read the documents she signs and she should not be allowed to pursue a claim for fraud or intentional misrepresentation where she has not, and cannot, allege facts to establish justifiable reliance."

---

[5] Pennsylvania common law does not distinguish between fraud and intentional misrepresentation.  Gibbs v. Ernst, 647 A.2d 882, 889 (Pa. 1994).

Id.

Shad responds in opposition that our Court of Appeals has found justifiable reliance where employees relied on an employer's misrepresentation to their detriment.  Resp. in Opp. at 33.  She urges that we rely on Voilas v. Gen. Motors Corp., 170 F.3d 367 (3d Cir. 1999), which she describes as denying a motion to dismiss plaintiffs' claim that defendant committed common law fraud by intentionally lying to employees about a plant to induce them to leave voluntarily, and Trans Penn Wax Corp. v. McCandless, 50 F.3d 217 (3d Cir. 1995), which Shad argues found a valid state law claim where defendant made false statements on which employees relied to decertify a union.  Resp. in Opp. at 33, 34.

Delta replies that Shad errs in relying on those cases because they address whether Section 301 of the Labor Management Relations Act preempts a fraud claim but not plaintiff's justifiable reliance.  Reply at 9.  Delta contends that the face of Shad's Amended Complaint establishes that her reliance was not justified because the alleged misrepresentation -- that the document she was asked to sign related to her doctor's note -- could have readily been discovered had she bothered to read what she was signing.  Id.

Shad contests Delta's characterization of the two cases on which it relies.  Sur-Reply at 8. She also argues that "it is entirely plausible that [she] would have signed, without reading first" a document her supervisor "ordered her" to sign.  Id. at 9.

Shad relies in error on Voilas.  In Voilas, GM employees who accepted a buyout package based on the auto manufacturer's assurances that the Trenton plant would be closed sued GM asserting state-law fraud claims when it later kept the plant open.  170 F.3d at 371.  The district court certified for interlocutory appeal whether the plaintiffs' fraud claim was preempted by either Section 301 of the Labor Management Relations Act, which provides the basis for an

28

employee's suit for violation of a collective bargaining agreement, or Sections 7 and 8 of the

National Labor Relations Act under a preemption doctrine that grants the National Labor

Relation Board exclusive jurisdiction over unfair labor practice proceedings.  Id. at 371, 378.

Neither of these issues touches on justifiable reliance -- and, even if they did, we are also

constrained to note that Voilas arose in New Jersey which had as yet not specified "what kind of

reliance is necessary" in a fraud cause of action.  Voilas, 170 F. 3d at 377 ("It is not entirely clear

to what extent New Jersey law requires that the reliance be justifiable") (internal citation

omitted).  In short, Voilas cannot help Shad.

In McCandless, our Court of Appeals also considered whether Section 301 of the Labor

Management Relations Act preempted a state law fraud claim by employees alleging the

employer induced them to decertify their union through contractual promises it made that it later

breached.  50 F.3d at 220.  Our Court of Appeals held that the employees' claim was

independent of their Collective Bargaining Agreement and therefore not preempted.  Id. at 229-

29.  As to the issue of justifiable reliance (and, indeed, all elements of the state law fraud claim),

our Court of Appeals held that "the employees need not depend on the collective bargaining

agreement to satisfy [the] elements of state law fraud."  Id. at 232.  "The essence of the

employees' case is proof of justifiable reliance on the separate guarantees, not on the collective

bargaining agreements," our Court of Appeals explained, id., but it drew no conclusions about

whether the employees had in fact justifiably relied on the employer's assertions or under what

circumstances.

The situation here materially differs.  Shad alleges she justifiably relied on her

supervisor's representations under circumstances where Delta contends the misrepresentation

was readily ascertainable.  We agree with Delta that Shad's reliance was not justified because

she could have readily discerned the content of the document she signed simply by reading it. Her allegation that she signed the document without reading it because her supervisor told her to do so does not excuse her blind reliance or failure to make a cursory examination of the document.

We will therefore grant Delta's motion and dismiss Shad's misrepresentation claims.

### B.       Shad's Sought After Leave To Amend

Although Shad has not moved for leave to amend her complaint as Fed. R. Civ. P 15 (a)(2) requires, her opposition to defendant's motion to dismiss urges us to consider our Court of Appeals's teaching in Alston v. Parker, 363 F.3d 229 (3d Cir. 2004).  In Alston, the Court held that "even when a plaintiff does not seek leave to amend, if a complaint is vulnerable to 12(b)(6) dismissal, a District Court must permit a curative amendment, unless an amendment would be inequitable or futile."  Id. at 235 (citations omitted).

Amendment is futile if it is frivolous, fails to state a claim upon which relief can be granted, or "advances a claim or defense that is legally insufficient on its face," Koken v. GPC Int'l, Inc., 443 F.Supp.2d 631, 634 (D.Del. 2006).  Shad has already amended her complaint once.  And we considered the new allegation she added in her response in opposition alleging that Delta failed to follow its established procedures and policies by coercing her into signing a resignation letter without her knowledge.  See Resp. in Opp. at 24.  But her Amended Complaint fails to nudge her claims across the crucial line that separates conceivable and plausible.  See Twombly, 550 U.S. at 570.  To grant her leave to amend her allegations under such

circumstances would be futile.

**IV.**    **<u>Conclusion</u>**

For the reasons detailed above, we will grant Delta's motion to dismiss all of Shad's

claims.

An appropriate Order follows.